Your Honor, I'm Bill Walker from Greenville, Mississippi. I am the owner of the Simmons Law Firm, and Mr. Moore represents the United States, and the whistleblower, Ms. Gwendolyn Porter. In this action, we assigned three issues. For my time for oral argument here, I think one of them is adequate. I think the one on the exhibits is more than adequately covered. I would like to spend my time, if I may, I'll be glad to answer questions on any of them, but on two issues. One would be the issue of materiality, whether or not we adequately pled the element of materiality in the false claims context. In pleading, we file the first amending pleading. And the second would be whether or not if I'm incorrect in that, and the court finds that I have not adequately pled that, that I should be granted leave to amend so as to permit me to do so, or to permit me the opportunity to do so. And I would show how that would be the judge's ruling. The judge ruled on that, that an amendment would be futile, and I would like to show where that is not the case. When we filed the first amended complaint, and I had filed several False Claims Act complaints before, the pleading standards as I understood them were governed by Twombly and Iqbal, so that I should file a statement of facts that presents a claim that is plausible on its face. Since it also dealt with fraud, I should do so with particularity, which I also did. I included in there what I thought were sufficient elements of each of the four elements of the False Claims Act, including materiality. Primarily, the issue was that these targeted case management activities were being conducted by people who were not minimally qualified to do so under the laws and statutes and regulations of the state of Mississippi. And that that had a direct bearing on what they should be paid. Now, it also goes to the fact that case management, and I know that there's some disagreement about this, but case management, I believe, forms an essential element of the contract here. What the state of Mississippi did is the state of Mississippi stepped outside and abrogated its responsibilities to the Medicaid, the poor, completely to these two companies. So there was a duopoly. They enjoyed a duopoly. If you were a poor person in Mississippi and you needed case management, only two places you could go to get it. And that was either Magnolia Healthcare or UnitedHealthcare of Mississippi. And during a period of time, the people that were furnishing that to you, which you didn't have a choice about who you got it from, were not qualified to give it. Now, the case management, the requirement to be an RN as opposed to an LPN is a material one, both with respect to payment and with respect to getting what you paid for. Are you relying solely on the Mississippi state statutes regarding the duties of the RN and the LPN, or is there some specific contractual provision or federal CFR or something that mandates that an RN perform those responsibilities? I'm not aware of any federal mandate that does that, Your Honor. So we're talking only about compliance with Mississippi statutory authority in the discharge of these duties? Yes, sir. Okay. In fact, let me address that directly. I furnished to the court in a Rule 28J letter an action which I think is dispositive on this case. What it does, we don't have to question ourselves about whether the court would opine whether it's material to comply with the state statutes on the minimum qualifications for the case manager. We have this instance where the case manager in Missouri, the Health and Human Services OIG, went in and clawed back money. You're asking us to take judicial notice of that? Yes, sir. Okay. Yes, sir. They clawed back money for case management because it did not comply with the state regulations in Missouri. Now, Missouri in that instance went and said, look, we can waive it. We can waive it and let this money go. And the Fed said, no, no, you're not going to do that. How do you reconcile that with, as I understand the facts in this case, not only was the contract continued after this was brought to the government's attention, but then it was renewed? Yes, sir. They seem inconsistent to me. Is there a particular reason why Missouri is one and Mississippi is the other? Yes, sir. It's my understanding that, and I would include this in my pleading if permitted to plead, my client at the Escobar came in between the two cases that I filed. One was filed pre-Escobar, one was filed post-Escobar. The post-Escobar case, when it was unsealed, my client was working at United Healthcare of Mississippi. And when it was unsealed and this fraudulent practice was exposed, the practices instantly stopped and they began complying with the law. I believe that the evidence will show that not only did United do that, but also Centene, well, Magnolia, the subsidiary of Centene, so that this evidence of continued payment becomes, transforms from evidence of immateriality into evidence of strong materiality when what happens is when the practice is exposed, they change their practices to get back in compliance with the state law, and so it causes a change in their conduct. And I think that takes one of my weaknesses and turns it into my strength. Are we going well outside of what this record actually supports at this stage? The 28J is asking us to take judicial notice of something happening in Missouri. The comments you're making now, are they supported by the records that there was a decision, a corporate decision, whatever, to get into compliance on using RNs? I put that in my brief, in one of my briefs, in my reply brief, Your Honor. How about what's in the record? In the record. In the record, the only thing that's in the record currently in that respect is that my client wrote two letters, anonymous letters, to the State Department of Medicaid, okay? We don't know what happened to them. Don't know where they went. Don't know what action was taken. Action could have been taken, could have not been taken. We don't know at this point in time. We then, the only other thing is that prior to the filing of this QUTAM action, I, as I'm required to do in every QUTAM action, give the United States Attorney notice that I'm about to file it prior to filing it, which I did here. And as with every other QUTAM case I've ever filed, the Department declined to intervene. The United States Attorney declined to intervene. Yet the statute, the False Claims Act statute, permits me to go forward nonetheless expressly. So with respect to that particular aspect, Judge Southwick, you are correct. That would be, I would be asking if permitted to be able to show that and perhaps any others that I could find in which the federal government has shown by its action, not an opinion but by its action, that it considers violations of the state law in producing, in providing these services to state recipients to be so material that if you file it, they will take the money back. Proceed. Go ahead. Thank you. The other thing that I think gives us value is the very essence of this contract is case management. Now, I know they've said a lot of things about other aspects of the contract, and that's true. But when someone goes on Medicaid, the first thing that happens, the very first contact is a phone call. It's an initial phone call from the case manager in which the case manager conducts an interview, and the interview, what the interview does is it sets forth the plan of what we're going to do from that point forward. How are you feeling? Trouble breathing? What kind of, you know, high blood pressure? And what are your ailments? And the case manager at that point in time initially undergoes a series of planning and diagnoses and trying to get on a course. Now, it may be that they send them to this doctor and this doctor, but that's how the whole process begins is that case management. And if someone is there that does not have sufficient critical thinking skills so as to do that, then the whole train is derailed from that point forward. So that's when I think it's part of the essence of the contract that that goes to. And secondly, with respect to the minimum, the qualifications, the licensing requirements, the education, when I obtain a law degree, that just, that lends a minimum value to my services. I know that, and maybe I'm not worth that, but at least it assures someone that I have at least done certain things to, I have the minimum qualifications of being a lawyer and allows me to charge commensurate with that. It has a direct relation to my value, to money paid. If I am not, if I don't have such a degree and I misrepresent myself, as the people did here, to have such a degree, then the money I receive from that is fraudulently obtained. Can't get around that. If I say I'm a lawyer and I'm not, and I'm not, and I don't have the education, and I'm up here talking to you now and I'm charging somebody a whole lot of money for that, then they're probably entitled to some of their money back. Kelsey, you're making some common sense arguments. I can't say they're foreign to the court, but nonetheless, what seems to me relevant is what did the government think was material, not what you can convince us are good analogies. So you're indicating now some things outside of the record that might indicate that the federal government considered these things to be material. What is in this record now to support that these were material failures to comply with their obligations? I have nothing in the record right now. Well, with respect to the failure to pay money, nothing to record right now. And let me say this. In the Escobar decision, when Escobar says we've got to start pleading facts and proof, I guess I'm an old lawyer and I'm used to pleading allegations and then having discovery and having the opportunity to discover things like that. I can't be at both sides at one time. There was an action that we took in sending those two letters. There are some inferences that can be drawn, but the inferences that are drawn that the lower court drew and that this court is asking whether it can draw, perhaps, are inferences that are in favor of the defendant, not in favor of the plaintiff. Under the precedence of the Fifth Circuit, the facts that I plead and the inferences that will be drawn from those facts should be viewed in the light most favorable to the plaintiff,  and if, as here, there are other explanations, and I have suggested possible other explanations for the continued payment for these services, then I think I should be entitled to explore that. Counsel, in your remaining time, I see you're running a little bit short here. Why don't you cover the issue of whether—what would you put in an amendment— Yes, sir. —to overcome the futility? Thank you. Thank you for that. If I were to amend, if I were permitted to amend, I would do what I did in the other one that got passed the motion to dismiss on this issue. I would include the violations of the statutes, the violations of the regulations, the violations of the letter agreement from the nurses' board, just like the Mississippi Board of Bar Examination. They had a letter to that effect that this is illegal. I would then include an affidavit from my client as to what happened, where she was when the cases were unsealed, and I would then include and attach as an exhibit proof, actual evidence, which is something I'm not used to doing, but would be the report from the OIG, which is self-authenticating, not subject to the hearsay rule, and relevant. In your other case, you got passed the motion to dismiss. Is that right? Sir? In your other case. Yes, sir. The other case before the other judge, I did. Have you been allowed to do any discovery in this case? No, sir. Have you done any discovery yet in the other case? No, sir. It stayed? It stayed pending this appeal, yes, sir. All right, counsel. You have time for rebuttal. Thank you all. Thank you. May it please the Court. Mr. Walker just told this Court that the record is bare as to support for a materiality claim in this case, and he's right, and that's what Judge Ogerton found in the district court. The record in this case, the plaintiff has pointed to no contractual provision, no state or federal law or regulation, statute or regulation, that requires case managers to be staffed by RNs. There's no contractual provision to say that. There's no federal law to say that or state law to say that. The record is bare on that. Okay, and what do you mean that there's no law requiring that? Where does the obligation arise, if at all, to use an RN rather than an LPN for the activities that are at issue in this case? There is not one. The contract doesn't require it. We went through a list a little while ago. So you're saying that his pleading is based on no obligation by statute, regulation, contract, not in the Bible, is it? No, there's nothing that will support this. That's exactly right. The contract is a 200-page-plus contract. The case management section constitutes five pages of that contract, and in that section of the contract, it spells out the duties of a case manager under the contract. The description of case management that Mr. Walker just gave you, I would tell you, is not drawn out by the contract. The contract describes those services as coordination of care, primarily administrative in nature. And the case management section of the contract, for example, doesn't mention the word nursing. It doesn't mention the word nursing assessment. It doesn't mention the word diagnosis. It's all administrative coordination of care-type services. There's simply no requirement in the contract that a case manager be a registered nurse or any kind of nurse, for that matter. The federal regulation says that case managers must have qualifications that are reasonably related to the population they're serving. The Missouri OIG opinion that was provided on Monday of this week quotes the federal regulation to say just that. What's important about the Missouri OIG report is, in that report, the OIG found that Missouri had violated its own state plan that set out requirements for case managers. The plan, not the statute. The state plan, not statute or regulation. The state plan amendment. How is the staffing practice that you all employ or have employed relative to this K? I don't know if it's the same or not. I know we covered a little bit of that when your opponent was at the podium. But how is the use of the LPNs as case managers not a violation of the Mississippi statute, so the state board of nursing standards? Well, a couple of things. There's no link between our contract and the case management functions as described in our contract and the nursing statutes or regulations in Mississippi. The only link that's been provided between those two is by the plaintiffs. The Division of Medicaid hasn't done that. The government hasn't done that. The way plaintiff gets there is the case management section in the contract states that the case manager will do a health risk assessment. And it says that the purpose of that health risk assessment is to determine what the care management or case management needs are for the patient. The same section of that contract states that the treatment plan for the patient must be done by the member's primary care physician. In other words, the case manager isn't doing the treatment plan. The doctor is. The section says that in the contract. But the plaintiff takes the phrase health risk assessment and then assumes or imposes that to mean the same assessment that's stated in the nursing board statutes and regulations. That's the only link. The contract doesn't say anything about nursing as a case manager. So you're saying that's not really a term of art, an industry term. It's just a term that is being associated with two different duties. That's right. That's right. And so the case management function in the contract is not associated with the nursing board's statutes and regulations. I would submit to you that even if it were, the nursing board does not require case managers to have an RN license or degree. The nursing board doesn't specify any specific educational requirements for case managers.  The problem with plaintiff's case. Let me ask you, counsel, at this stage there's an argument about what is in the Mississippi statutes and elsewhere mean that what is in your contract requires RNs. It's an issue of what exactly is occurring, it seems to me, under your contract that LPNs are being used for and how well that matches or doesn't match with statutory obligations to use registered nurses. That suggests to me it may be premature to be resolving this case. Well, what I would say, Judge, is there are no statutory requirements to use RNs as case managers. It's not there. Well, but there are statutory requirements to use RNs in certain situations and we're using the term right now, case management. Is what's going on with Magnolia's use of LPNs, does it fit within what the court has ever labeled? Isn't that sort of underlying what this dispute is about? It's what the dispute is about, but no, it does not fit within the RN, the nursing statutes and regulations. The nursing statutes and regulations impose requirements on nurses on a level of knowledge they must have for nursing treatment, clinical nursing treatment. There is no clinical nursing treatment under this contract. These are coordinators of care and administrative. They call and make sure the patient's got an appointment scheduled or they make sure that the patient follows up when they're supposed to. It's a coordination of care. And so the problem here is the leap between the case management as contemplated by the contract is not made except for by the plaintiff's conclusion that the case management in the contract is a nursing function. We know the division never intended that. One, because they didn't put it in the contract. Two, but the plaintiff or appellant has referred this court to several exhibits and they claim that the district court erred by not looking at those exhibits. But one of those exhibits, Exhibit N in the record, is Magnolia's enrollee handbook. The plaintiff has pled that in the enrollee handbook, Magnolia says, our case managers are RNs or social workers. The plaintiff has said that that handbook, and he's right, is submitted to the division before it's ever allowed to be published back when the contract started and also that the handbook has to be approved every year before it's published again to the members. What that tells us is, is Magnolia told the division of Medicaid way back in 2010 that they were going to use someone other than RNs for case management functions, the social worker. And so we know that the division has known from the very start that we weren't using just nurses for this. Of course, social workers have no medical training. Social workers don't treat patients clinically. They don't do any kind of nursing assessment. They're social workers. They're even further removed from a nursing function than LPNs. And so the case that the plaintiff has filed against UnitedHealthcare, are you representing UnitedHealthcare? No, sir. You're familiar with the case, though? Yes, sir. And I guess somebody thought there was enough similarity that that case should be stayed pending the outcome of this case. Well, the parties in that case, in my understanding, agreed to a stay. The judge didn't oppose that. The parties agreed that they would see the outcome of this case before they went on in that case, I assume for economical reasons. Maybe I need to reserve my questions for the plaintiff when he gets up on it. I will tell you that Judge Garola's opinion in that case, quite frankly, I think materiality got lost in the shuffle. The motion to dismiss in that case was on every element, or at least three of the four elements of a false claims act case. Judge Garola gave about two sentences of analysis to the materiality claims of the plaintiff, and he did not hold the plaintiff's materiality pleadings up to Escobar. And he also accepted as true plaintiff's claims in the complaint that are not in the contract. Judge Ogerden, by contrast, rejected some of those claims because they were directly contradicted by the plain language of the contract that the plaintiff attached to the complaint. And so for those reasons, I don't know that that case is guidance to us in this one. I would say that the most important thing here for this case is that the plaintiff has pled that the Division of Medicaid was notified twice in 2011 by letter of Magnolia's alleged misrepresentations. Separately, they informed the federal government and pled in their complaint that they gave the government enough information and documents and material evidence to do a thorough and quick investigation. I think the government's view on materiality is telling. What they think about those alleged misrepresentations and how that goes to materiality is evidenced by their response. Their response was to continue paying hundreds of millions of dollars under the contract via the capitated rate and to reaward the contract now three times, including in 2017, again to Magnolia. The contract language for case management doesn't change. There's no requirement for nursing services. There's no requirement for nursing functions or clinical treatment of the case managers. I think that's telling to our case today. We know that the federal government doesn't impose a requirement for case managers to be RNs. We know that from the federal regulations that are cited in the Missouri opinion that say there are no specific requirements for education or license of case management. It's just that they have to be reasonably related. Their experience has to be reasonably related to the populations they're serving. We also know the federal government doesn't care that LPNs are used as case managers for Medicaid enrollees because other states specifically have passed regulations saying that case managers can be LPNs. California, Arkansas, Vermont all have regulations saying that. Of course, those regulations are not dispositive here to Mississippi and what Mississippi thinks of it, but it is telling as to what the federal government believes. It just defies logic to think that the federal government would think this is material in Mississippi, the use of LPNs as case managers, while simultaneously allowing LPNs to be case managers in other states. Those two things just are difficult to reconcile. I would suggest to the court that our case is, if you look at Escobar and the factors, the non-dispositive factors the Supreme Court set out for looking at materiality, there's not a single factor from Escobar that supports materiality in this case. Escobar gave us non-dispositive factors. One was an express condition of payment. It's not present in this case. There's no express condition of payment. One was the government's consistent refusal to pay. That's not present in this case. We know the government has paid since 2010 for this service by LPNs and continues to do so today. We know the federal government has endorsed that because they're paying in other states for LPNs as case managers. By the same token, Escobar tells us that where the government regularly pays claims despite knowledge of the alleged misrepresentations, it's strong evidence of immateriality. That's where we are in this case. The government's paid since 2010. They were notified of this in 2011 and every year since then via the enrollee handbook where we tell them specifically we may use social workers, i.e. not nurses, not clinical staff, to do the job. And they continue to pay and have continued to reaward the contract. Just one more quick point on the actual contract. It's important to note that Magnolia is an administrator of the state Medicaid program in that they administer covered services, which is a defined term in the contract to Medicaid enrollees. Covered services are delineated in the contract, and according to the plaintiff in the complaint, they're primarily clinical in nature, things you would think of with your normal insurance company. Who makes the decision about whether or not to contract with Magnolia?  Is that the Division of Medicaid? The decision about whether or not to contract with Magnolia. Who makes that decision? There's an RFP process that companies bid. Now there are three companies doing this. The Division makes the decision. The legislature allows the Division to do managed care in the first place, and then the Division awards the contract, but those are then approved by CMS and have to be approved by CMS. But the contract is for provision of clinical services, medical services. Case management is a part of the contract, but it's a small part of the contract. The rate that's paid is not a fee-for-service model where claims are submitted. It's a capitated model where Magnolia receives a set fee on a per-member, per-month basis for every member they sign up. So, for example, if I were a Magnolia member, they may receive $100 for me as a member as an all-inclusive insurance premium type of payment for all the services rendered under the contract. That's far different than a fee-for-service model where a claim is submitted and they're reimbursed. And it goes to materiality because the idea that this case management function would be so material or so central that it forms the essence of the bargain for the entire contract is just not supported in fact or certainly by the pleadings. Your Honor, I just want to address, Your Honors, I want to address quickly the plaintiff's argument on Judge Osherden's denial of his request to leave to amend. First, the plaintiff, the appellant stated that it was a timing issue between Escobar, the drafting of his complaint and Escobar being handed down. But Escobar was handed down in June of 2016. The complaint was not served until June of 2017. There was no request for leave to amend in those 11 months to re-plead Escobar. Secondly, in two footnotes in the plaintiff's response to the motion to dismiss, he asked for leave to amend to re-plead the complaint and he asked to do only two things. He asked to add the nursing statutes and he asked to add the nursing board regulations. Judge Osherden rightly found that that leave, the leave to amend, would be futile for the same reasons we've talked about. Judge Osherden found that the nursing board statutes and regulations do not require case managers to be RNs. They do not require case managers to be nurses. Judge Osherden found that the contract does not require that. And so because of that, any amendment for those grounds, which are the only ones the plaintiff asked for, would be futile. And, of course, as this court knows, the plaintiff has held to what he asked the district court to amend for. In other words, today he said he would add a lot of different things, affidavit from his client and other things. He didn't ask Judge Osherden for that. He asked Judge Osherden to amend to add the statutes and the regulations on nursing. Both of those would be futile and would not save his complaint. I would lastly just, as this court knows, Escobar cautioned that False Claims Act litigation is not an all-purpose anti-fraud statute and it's not a vehicle for imposing run-of-the-mill breach contract actions or enforcing run-of-the-mill breach contracts. This court also cautioned in Harmon that Congress enacted the False Claims Act to vindicate fraud on the federal government, not to second-guess decisions made by those in power through the democratic process to shape public policy. Reversing the district court, I would suggest to you, would go against both those cautions. The record is bare, and Mr. Walker said so just now. The record is bare as to support for materiality. Judge Osherden rightly found that. What we're left then with is a garden variety breach contract case that, quite frankly, would not survive a motion to dismiss under contract law because of the plain language of the contract. And then to allow this case to go forward on the record the court has before it today would essentially be allowing Ms. Porter to second-guess the division of Medicaid in the federal government as to the use of LPNs for case managers. And that's not the purpose and has never been the purpose of the False Claims Act. So if there are no other questions. Thank you. You didn't say your name when you first started. How do you pronounce it? I'm sorry. Tim Sensing. Sensing. Thank you. Please, Court. Your Honor, first of all, let me correct a few things. Strict compliance with state law regarding case management is required. Let me quote from the contracts just a bit. All contracts, and I'm reading from my brief, all contracts include identical language in the respective sections dealing with the division, division is the Mississippi Division of Medicaid, policies and procedures, which, quote, the contractor shall comply with all applicable policies and procedures of the division, specifically including without limitation all policies and procedures applicable to each category of covered service for the MISCAM program, which are covered by the state plan, all of which are hereby incorporated by reference. Then it goes further to say this. The contractor shall maintain at all times during the term of this contract adequate staffing sufficient to serve the needs of enrollees as specified in this contract proposal and in accordance with both appropriate standards of both specialty and subspecialty care. And then finally, with respect to case management, it says this. Medical management staffing shall be at a level that is sufficient to perform all necessary medical assessments and to meet all Mississippi Medicaid enrollees' case management needs at all times. That's a specific reference to the case management Mississippi enrollees' needs. I think it's how can the one who is going to be doing the case management on behalf of the state of Mississippi not comply with the minimum state Mississippi standards? They're doing it on behalf of the state of Mississippi itself. Now, he said that this is a big contract, and certainly on the capitated rate aspect of it, that's like we can't make any, since we've got a capitated rate, does that mean the way they structure their contract means I can't sue them for fraud? They can get away with fraud? Of course not. Counsel, we have to apply ESCOBAR. We have to apply ESCOBAR to this case and other controlling case law. And it does seem to me ESCOBAR comes off of close to talking about language similar to what you're discussing. And the mere fact that the government might be able to refuse to pay for failure to comply with certain things isn't controlling. It's whether they do refuse to pay because of violations of certain terms and the provisions. So where we are on pleadings is for you to show us something to indicate it's more than just speculation that the government considers what you just told us to be material or some other thing to be material that Mississippi is violent. Well, what I would point to would be the ESCOBAR. What ESCOBAR said is no single factor is controlling or not, that the court must look at it holistically and weigh all the factors. And then when we got to ESCOBAR 2 and it remanded it back to the First Circuit in ESCOBAR 2, they said this is so, this minimum licensing requirement and minimum education is so fundamental to the provision of medical services that it must be material, that we find it's material. And that's what I would rely upon there. And in addition, like I say, the notion that they can perform these services for a large portion of the people in Mississippi and not comply with Mississippi law is just, that's committing fraud. And it's the poorest of the poor and the sickest of the sick. And when somebody calls you on the telephone, this is going to happen more and more in this court, there's going to be more tele-nursing, there's going to be more tele-doctoring, there's going to be more things as these times continue, these problems are going to grow more and more and more. When that person picks up that phone, they have no way of knowing what education that person has. They have no way of knowing what degrees they have. They assume that since they are visited with the authority of the state, that they at least carry the minimum qualifications of a state employee who would do that. And may I get to one other thing, and that is here what we do is we're on a motion to dismiss, and we're sitting here arguing over evidence, you know. We've come a long way from where this all began. And I'm wondering whether or not now in whether or not whenever we say that pleadings, a motion to dismiss is governed by Twombly and Iqbal, that we don't need to start dropping a footnote and say, well, it's Twombly, Iqbal, and oh, by the way, in one particular statutory cause of action called the False Claims Act, and with one particular element of that, the element of materiality, we've got to start proving. We've got to get proof, and we've got to get evidence, and we've got to get all this other stuff. And that's why I think that this area of law is so confusing both to the circuits and to the district courts and to the practitioners, quite frankly. Well, we'll do the best we can in explaining this particular case. Thank you both sides for bringing this argument to us today. Thank you, Your Honor. We'll take a brief recess.